*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MID-CENTURY INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>RAYMOND NELSON, MARIA NELSON, DAVID HYNES (interested party), ANNAMARIE MCILVAIN (interested party), and the ESTATE OF LUCAS Z. HYNES (interested party),<br><br>    Defendants. | Civil Action No. 19-08564 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

In this insurance coverage dispute, Plaintiff Mid-Century Insurance ("Plaintiff") seeks a declaratory judgment under 28 *U.S.C.* § 2201 that it has no obligation to defend, indemnify, or to otherwise provide coverage to Defendants Raymond Nelson ("Raymond") and Maria Nelson ("Maria") (together with Raymond, the "Nelsons") for the lawsuit, injuries, settlement, award or any compensation in relation to the fatal drowning of minor child Lucas Hynes ("Lucas") at the Nelsons' home. The Nelsons and Interested Parties David Hynes ("Hynes"), Lucas' father, Annamarie McIlvain ("McIlvain"), Lucas' mother, and the Estate of Lucas Z. Hynes (collectively the "Interested Parties") each filed a motion for summary judgment, seeking a declaration that Plaintiff must defend and indemnify up to the liability policy limit of the Nelsons' insurance in connection with Lucas' death. Plaintiff also moves for summary judgment on the same claim.

For the reasons set forth herein, Plaintiff's Motion for Summary Judgment is **DENIED**, the Nelsons' Motion for Summary Judgment is **GRANTED in part**, and **DENIED in part**, and

the Interested Parties' Motion for Summary Judgment is **GRANTED in part**, and **DENIED in part**, as follows: because issues of genuine material fact exist as to whether McIlvain and Lucas were residents of the Nelsons' household under the insurance policy's personal liability exclusion provision, summary judgment on this question is denied.  However, the Court grants summary judgment in favor of the Nelsons and the Interested Parties on the issue that Lucas was not an "Insured" under the Nelsons' insurance policy.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

The following facts are undisputed unless otherwise noted.  The Nelsons live in a single family home located at 64 Fort Plains Road, Howell, New Jersey.  (Plaintiff's Statement of Material Facts ("PSOF") at ¶¶ 2-3.)  McIlvain and her four-year-old autistic son, Lucas, lived with the Nelsons from April 2018 to July 2018.  (*Id.* at ¶ 5.)  The Nelsons are not related to McIlvain or Lucas.  (Interested Parties' Statement of Material Facts ("IPSOF") at ¶ 16.)  Rather, McIlvain was a friend of Raymond's stepson, Ryan Kreger ("Ryan"), (PSOF at ¶ 14); the Nelsons did not meet McIlvain and Lucas until April 2018.  (*See* Certification of David D. Blake, Esq. in Support of Plaintiff's Motion for Summary Judgment ("Blake Cert."), Ex. B, Raymond's Dep. Tr., 7:11 to 19.)

Prior to April 2018, McIlvain and Lucas lived in a motel room with McIlvain's mother because their home was being sold.  (*Id.* at ¶ 14; Nelsons' Statement of Material Facts ("DSOF") at ¶ 1.)  Following the sale of their home, McIlvain and Lucas had planned to relocate to Virginia where they would live with McIlvain's uncle.  (DSOF at ¶ 1.)  The relocation, however, would result in Lucas changing schools.  (*Id.* at ¶ 1.)  Recognizing the difficulties associated with McIlvain's housing situation, the Nelsons invited McIlvain and Lucas to live at their home until

2

McIlvain found a more suitable and permanent residence in Howell.  (PSOF at ¶ 14; DSOF at ¶¶ 6-7.)  McIlvain agreed to move into the Nelsons' house, so that Lucas could remain at his school.  (DSOF at ¶ 10.)  According to McIlvain, she and her son only intended to stay with the Nelsons for a short duration, while she saved money for an apartment.  (PSOF at ¶ 25.)

In exchange for living at the Nelsons' home, McIlvain offered to pay the Nelsons $600.00 each month in rent; however, there was no written lease agreement.  (IPSOF at ¶ 19.)  On at least one occasion, McIlvain purchased groceries for the Nelsons in lieu of making a rental payment.  (*Id.* at ¶ 21.)  During her time at the Nelsons' home, McIlvain had complete use of the living room, kitchen, dining room, and a bathroom.  (*Id.* at ¶ 24.)  McIlvain and Lucas, with their own bed, shared a bedroom with Ryan.  (*Id.* at ¶ 24.)  With respect to personal items, McIlvain and Lucas brought their own clothes, towels, linens, blankets, and pillows to the Nelsons' home.  (*Id.* at ¶ 25.)  McIlvain also purchased her own groceries and toiletries.  She stored the food in certain sections of the refrigerator and kitchen cabinets that were designated for her use.  (*Id.* at ¶¶ 26-27.)  As for laundry and other everyday tasks, McIlvain generally cleaned after herself and Lucas.  (*Id.* at ¶ 28.)  Indeed, McIlvain washed the pots and pans used by her and Lucas; placed their dishes, utensils, and other items in the dishwasher; and washed their clothes separately from the Nelsons.  (*Id.* at ¶ 28.)  From the day that McIlvain moved into the Nelsons' home until July 29, 2018, she and Lucas did not live in any other place.  (PSOF at ¶ 20.)[1]

On July 29, 2018, after approximately three months at the Nelsons' home, Lucas tragically died after drowning in the Nelsons' swimming pool.  (IPSOF at ¶ 1.)  Just prior to his death, Lucas and McIlvain were swimming in the pool with Maria, the Nelsons' grandchildren, Hunter and

---

[1]    There are additional relevant facts that will be discussed *infra,* in connection with the inquiry into whether McIlvain and Lucas were residents of the Nelsons' household.

Isabella, and McIlvain's niece.  (*See* Certification of Robert Y. Cook, Esq. in Support of the

Interested Parties' Motion for Summary Judgment ("Cook Cert."), Ex. H, McIlvain's Dep. Tr.,

51:23 to 52:3.)  McIlvain asked Maria to watch Lucas while she went inside the house to change

her niece's diaper.  (*Id.* at 52:22 to 53:13.)  While McIlvain left the pool area, Maria instructed the

children, including Lucas, to get out of the pool so that she could prepare dinner.[2]  (*See* Cook Cert.,

Ex. C, Maria's Dep. Tr., 9:2 to 25.)  According to Maria, she removed Lucas' lifejacket and closed

the gate to the pool area.  (*Id.* at 9:14 to 20, 10:18 to 20.)  Maria also testified that the children

remained outside in the Nelsons' yard upon exiting the pool area.  (*Id.* at 11:2 to 8.)  Maria observed

McIlvain watching television when she returned to the house.  (*Id.* at 21:15 to 18.)  At some point

thereafter, Maria asked the children to come inside for dinner.  (*Id.* at 12:2 to 3.)  Although Maria's

testimony is slightly vague, she recalled seeing Lucas on the porch of the home with Hunter and

Isabella.  (*Id.* at 12:10 to 15.)  Approximately five minutes later, however, Isabella asked Maria

about Lucas' whereabouts.  (*Id.* at 12:16 to 13:9.)  It was at this point that Maria and McIlvain

discovered that Lucas had not returned inside the house with the other children.  (*Id.* at 13:6 to 9.)

McIlvain discovered Lucas in the swimming pool after a frantic search of the Nelson's yard.  (*See*

Cook Cert., Ex. H, McIlvain's Dep. Tr., 14:21 to 23.)  Following Lucas' death, McIlvain did not

return to the Nelsons' residence.  (PSOF at ¶ 5.)

---

[2]     McIlvain and the Nelsons provide conflicting testimony regarding Raymond's presence on
July 29, 2018.  According to the Nelsons, Raymond was present at the home, but he left to perform
errands just prior to the drowning incident.  (*See* Certification of Jeffrey A. Malatesta, Esq. in
Support of the Nelsons' Motion for Summary Judgment ("Malatesta Cert."), Ex. B, Raymond's
Dep. Tr., 11:17 to 22; Cook Cert., Ex. C, Maria's Dep. Tr., 30:16 to 31:13.)  McIlvain, however,
testified that she has no recollection of Raymond being at the house that afternoon.  (*See* Cook
Cert., Ex. H, McIlvain's Dep. Tr., 53:11 to 13.)  This dispute is not relevant to the resolution of
these motions.

4

**B.     Procedural History**

On February 15, 2019, the Interested Parties filed a Complaint in the Law Division of the New Jersey Superior Court, Monmouth County, *David P. Hynes, Jr. v. Maria Nelson, et al.*, MON-L-624-19 ("Superior Court Action").  (IPSOF at ¶ 4.)  The Superior Court Action asserts wrongful death, survivorship, and other claims under New Jersey law against the Nelsons arising out of the drowning incident.  (*Id.*)  Specifically, the Complaint claims that the Nelsons are responsible for the ownership, operation, maintenance, control, and supervision of the swimming pool located on their property, and that Lucas died as a direct and proximate result of the Nelsons' negligence related to the supervision or operation of the swimming pool.  (*See* Blake Cert., Ex. C, Superior Court Action Complaint.)

The Nelsons are the named insureds under a Farmers Smart Plan Home insurance policy ("Policy") issued by Plaintiff.  (PSOF at ¶¶ 1-3.)  The Policy provides, in part, personal liability insurance for the Nelsons in the amount of $300,000.00.  (*Id.* at ¶ 4.)  Specifically, the Policy provides that Plaintiff "will pay those damages which an insured becomes legally obligated to pay because of: (1) bodily injury resulting from an occurrence; or (2) property damage resulting from an occurrence."  (IPSOF at ¶ 6.)  Pursuant to the Policy, Plaintiff has defended the Nelsons in the Superior Court Action, but it also reserved the right to disclaim coverage based on certain exclusions in the Policy.  (*Id.* at ¶ 7.)

On March 14, 2019, Plaintiff filed a Complaint in the instant matter seeking a declaratory judgment under 28 *U.S.C.* § 2201, that it has no obligation to defend or indemnify the Nelsons for any claims in the underlying Superior Court Action.  (PSOF at ¶ 8; IPSOF at ¶ 9.)  Plaintiff argues that the Policy's personal liability exclusion permits it to disclaim coverage for bodily injuries or personal injuries suffered by (1) insureds and (2) residents of the Nelsons' household.  (*See* Compl., ECF No. 1.)  Plaintiff reasons that because Lucas and McIlvain were part of the Nelsons'

5

household at the time of Lucas' death, it has no obligation to provide coverage under the Policy. (Pl.'s Summary Judgment Moving Br., at 10-18.)  Alternatively, Plaintiff contends that because Lucas was a permanent resident of the household, under the age of twenty-one, and in the care of Maria immediately prior to the drowning incident, he meets the definition of an "Insured," and thus, there is no coverage for this tragic death.  (*Id.* at 19-24.)[3]

## II.   <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c).  A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable [factfinder] could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

---

[3]    The language of the Policy's personal liability exclusion provision and the definition of the term "Insured" will be discussed, *infra*.

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence … that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

III.   **DISCUSSION**

Plaintiff, the Nelsons, and the Interested Parties have each moved for summary judgment on the issue of insurance coverage under the relevant policy.   General principles regarding insurance policies and coverage are not disputed.  "[I]nsurance policies are contracts of adhesion and are subject to special rules of interpretation."  *Lee v. Gen. Acc. Ins. Co.*, 337 N.J. Super. 509, 513 (App. Div. 2001).  "[P]olicies should be construed liberally in [the insured's] favor to the end that coverage is afforded to the full extent that any fair interpretation will allow."  *Longobardi v. Chubb Ins. Co. of N.J.*, 121 N.J. 530, 537 (1990) (internal quotations omitted).  "Notwithstanding that premise, the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability."  *Id.*  If there is an ambiguity, however, it should be decided in favor of the insured.  *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 229 N.J. 196, 208 (2017).   In addition, the doctrine of reasonable expectations allows "the insured's reasonable expectations ... to bear on misleading terms and conditions of insurance contracts and genuine ambiguities are resolved against the insurer."  *Id.* (citations omitted).   Nevertheless, a court "should not write for the insured a better policy of insurance than the one purchased." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 158 N.J. 662, 670 (1989).

A.     **The Household Exclusion**

First, Plaintiff argues that it is not obligated to defend or indemnify the Nelsons pursuant to the Policy's personal injury exclusion because McIlvain and Lucas were residents of the Nelsons' household at the time of Lucas' death.  (Pl.'s Summary Judgment Moving Br., at 10.) Specifically, the exclusion provides:

> 1.  Any Insured or Other Residents of any Insured's Household.

8

We do not cover bodily injury or personal injury to:

    a.  any insured, or
    b.  any resident of any insured's household.

However, we do cover bodily injury to a residence employee unless the bodily injury is the result of the conduct of an insured or representative of an insured which would be serious and willful misconduct under the workers' compensation laws.

(*See* Cook Cert., Ex. E at Section II, page 38.)

Generally, "insurance policy exclusions must be narrowly construed; the burden is on the insurer to bring the case within the exclusion." *American Motorists Ins. Co. v. L-C-A- Sales Co.*, 155 N.J. 29, 41 (1998) (quoting *Princeton Ins. Co. v. Chunmuang*, 151 N.J. 80, 95 (1997)). Conversely, clauses that extend coverage are to be viewed broadly and liberally. *Mazzilli v. Accident & Cas. Ins. Co.*, 35 N.J. 1, 8 (1961). "Exclusionary clauses are presumptively valid and are enforced if they are specific, plain, clear, prominent, and not contrary to public policy." Therefore, if the words in an exclusion are clear and unambiguous, "a court should not engage in a strained construction to support the imposition of liability." *Longobardi*, 121 N.J. at 537. However, if more than one possible interpretation exists, courts should apply the interpretation that supports coverage. *Flomerfelt v. Cardiello*, 202 N.J. 432, 442 (2010).

Here, Plaintiff contends that the personal injury exclusion is clear, unambiguous, and the term "household" does not require a "familial" relationship between the Nelsons and McIlvain or Lucas. (Pl.'s Summary Judgment Moving Br., at 10.) In support of its position, Plaintiff cites to the language of the exclusion provision, which Plaintiff maintains, does not include the word "relative," "member," or any other word or phrase that might imply a family relationship is required to disclaim coverage. (*Id.* at 16.) According to Plaintiff, because Raymond testified that he considered McIlvain and Lucas to be residents of the Nelsons' home, no further inquiry is

required to disclaim coverage.  (Pl.'s Summary Judgment Reply Br., at 11-15.)  The Nelsons and the Interested Parties, however, argue that because the term "household" is undefined in the Policy, the exclusion provision is subject to more than one interpretation.  (Nelsons' Summary Judgment Moving Br., at 9; Interested Parties' Summary Judgment Moving Br., at 10-11.)  They emphasize that the term "household" is generally defined as an "organized family unit consisting of all those who share in the privileges and duties of a common dwelling."  (Interested Parties' Summary Judgment Opp. Br., at 9 (citing *Fireman's Fund of New Jersey v. Caldwell*, 270 N.J. Super. 157, 167 (Law Div. 1993)).  In that regard, McIlvain and Lucas were not part of the Nelsons' household simply because they lived in the Nelsons' home.  Instead, the Nelsons and the Interested Parties insist that Plaintiff has failed to establish that McIlvain and Lucas were integrated into the Nelson family unit.  (*Id.* at 12.)

After a review of the Policy, this Court finds that the term "household," which is conspicuously undefined, is ambiguous and open to more than one interpretation.  Indeed, as early as 1999, the New Jersey Supreme Court held that the term "household," in an insurance policy, may be interpreted in different ways if no definition is provided.  *Gibson v. Callaghan*, 158 N.J. 662, 672 (1999).  The dispute in *Gibson* arose because the named insured and the relative seeking coverage did not reside together.  *Id.*  Rather, the insured moved out of the house she owned, but she continued to maintain her homeowners' policy.  *Id.*  Although the insured intended to return to the house, the insured's grandson and his wife moved into the house in the interim.  *Id.* at 665-66.  During that period, a dog owned by the grandson's wife seriously injured an 88 year old woman.  *Id.* at 667.  After the woman filed a complaint against the grandson's wife, the wife filed a third-party complaint against Allstate Insurance Company, asserting that, because she resided in the named insured's house, she was entitled to a defense and indemnification under the

homeowners' policy. *Id.* In finding that the insured's grandson and his wife were residents of the insured's household, the Court reasoned that without a definition for the phrase "resident of your household," the insurance policy was "susceptible to two interpretations." *Id.* at 677. The Court found that "whether a relative of a named insured is a resident of that insured's household 'will depend on the facts of each case.'" *Id.* at 672 (citing *Sjoberg v. Rutgers Cas. Ins. Co.*, 260 N.J. Super. 159, 164 (App. Div. 1992)); *see also Miller v. United States Fidelity & Guar. Co.*, 127 N.J. Super. 37, 41 (App. Div. 1974) ("[The meaning of 'resident of your household'] may vary according to the circumstances in each case."). Despite having the benefit of this New Jersey Supreme Court decision, Plaintiff, the insurer, has elected to leave "household" undefined in its Policy. If Plaintiff intended the term "household" to refer broadly to any person living in a policyholder's home, it could have so defined the term in that way.

Accordingly, where no definition is provided for the term "household" in an insurance policy, as is the case here, New Jersey courts have considered whether a "substantially integrated family relationship" exists among the insureds and the resident. *See Mazzilli v. Accident & Cas. Ins. Co.*, 35 N.J. 1, 19 (1961); *Arents v. General Accident Ins. Co.*, 280 N.J. Super. 423, 429 (App. Div. 1995). Relevant factors to consider are: 1) whether the proposed resident paid rent at fair market value, 2) whether food and household goods were purchased jointly or separately, 3) whether housekeeping responsibilities were allocated evenly, and 4) whether the proposed resident and the insured ate meals together. *See Fireman's Fund*, 270 N.J. Super. at 167. Importantly, the mere fact that "two people reside under the same roof is neither necessary nor sufficient for a finding that those people share a 'household.'" *Gibson*, 158 N.J. at 672.

For example, in *Sierfield v. Sierfield*, 414 N.J. Super. 85, 96-97 (App. Div. 2010), the New Jersey Appellate Division found that there was a "substantially integrated family relationship"

among a plaintiff and her parents, when the plaintiff resided at her parents' household at the time of a dog bite incident.  Although the plaintiff claimed that the living arrangement was temporary, the appellate panel reasoned that the parties were related by blood, the plaintiff had no rental agreement and did not pay rent, utilities, or contribute to household expenses, the plaintiff's driver's license contained her parents' address, and the plaintiff's car was insured and registered at her parents' home.  *Id.*  Consistent with the line of cases evaluating this issue, the appellate panel also considered the frequency with which the plaintiff socialized and shared meals with her parents.  *Id.* at 97.  Conversely, in *Fireman's Fund of New Jersey*, 270 N.J. Super. at 167, the Law Division found that the "mere residence of a relative in the home of an insured, as a matter of law, does not constitute the relative a member of the insured's household."  Rather, to be a member of a household there must be a "familial relationship" and "at least some significant prerogatives of family life."  *Id.*  In particular, the court identified factors such as the sharing of companionship and "joint domesticity," whether rent was paid at fair market value, whether food and household goods were purchased jointly or separately, and how housekeeping responsibilities were divided amongst the residents.  *Id.* at 167-68.

Here, Plaintiff argues that even if the Court were to require evidence of a "familial relationship," McIlvain and Lucas were members of the Nelsons' household.  (Pl.'s Summary Judgment Moving Br., at 17.)  In support of its position, Plaintiff highlights that McIlvain and Lucas received mail,[4] slept, ate meals, and kept their belongings at the Nelsons' home.  (*Id.* at 12.)  Plaintiff also emphasizes that the Nelsons' relationship with McIlvain and Lucas was not financially motivated.  (*Id.* at 13.)  To support that position, Plaintiff points to the fact that the

---

[4]      Indeed, McIlvain finally changed her address from her mother's former home to the Nelsons' address so that was the address used by Lucas' school and where he got his school bus.

Nelsons did not require a security deposit or written lease agreement, did not charge McIlvain market rate rent, assisted McIlvain with the purchase of a safer vehicle to transport her son, and secured auto insurance for the car. (*Id.*) Further, Plaintiff points to evidence of Lucas' interactions with Raymond and Maria, including the fact that Raymond would retrieve Lucas from the bus stop after school and would occasionally pick up Lucas from school when he was ill and McIlvain was unavailable. Plaintiff argues that these facts demonstrate an integrated family relationship. (*Id.*) Therefore, Plaintiff maintains that the Policy's personal liability exclusion provision does not afford coverage for the lawsuit, injuries, settlement, award or any compensation in connection with Lucas' death. In response, the Nelsons and the Interested Parties argue that summary judgment should be granted in their favor because McIlvain and Lucas were merely temporary guests at the Nelsons' house. (Nelsons' Summary Judgment Moving Br., at 10-11; Interested Parties' Summary Judgment Moving Br., at 14.) The Nelsons and the Interested Parties stress that McIlvain and Lucas are not related to the Nelsons, they paid $600.00 per month in rent, and generally maintained separate lives within the home. (Interested Parties' Summary Judgment Moving Br., at 15.) Specifically, they argue that McIlvain purchased household goods for her and Lucas, including food and other personal items, and washed their own dishes and clothes. (*Id.*)

After carefully reviewing the record and all submissions by the parties, including the sworn statements of Raymond, Maria, McIlvain, and Hynes, I find that significant issues of material fact exist, precluding summary judgment for any party, and requiring the finder of fact to weigh the credibility of the parties and their witnesses. Namely, conflicting evidence exists in the record with respect to the financial support provided to McIlvain and Lucas by the Nelsons, McIlvain's participation in daily household chores and the frequency of shared meals, and the nature of the Nelsons' personal relationship with McIlvain and Lucas.

First, although it is undisputed that McIlvain offered to pay the Nelsons $600.00 per month in rent, Plaintiff suggests that the financial circumstances surrounding McIlvain's living arrangement evidences a more familial relationship.  Plaintiff questions whether $600.00 per month is consistent with the fair market value for comparable rentals in the area.  (Pl.'s Summary Judgment Moving Br., at 6.)  Additionally, Plaintiff argues that the absence of a lease agreement and the fact that McIlvain did not contribute to monthly utilities, including water, heating and electric, cable, or internet, further evidence the family dynamic between McIlvain and the Nelsons. (*Id.*; *see also* Blake Cert., Ex. B, Raymond's Dep. Tr., 32:9 to 19.)  The record also reflects that the Nelsons assisted McIlvain with the lease of a Ford F-150 truck because they believed McIlvain needed a safer vehicle to transport Lucas.  (Blake Cert., Ex. B, Raymond's Dep. Tr., 19:14 to 20:21.)  When McIlvain did not qualify for a loan, however, it is undisputed that Raymond leased the vehicle in his name.  (*Id.; see also* Cook Cert., Ex. B, McIlvain's Dep. Tr., 44:18 to 45:4.)  It is further undisputed that title for the vehicle was in Raymond's name and the vehicle was insured under the Nelsons' insurance policy.  (Blake Cert., Ex. B, Raymond's Dep. Tr., 19:14 to 20:21.) According to Plaintiff, these good faith gestures demonstrate a level of care and affection uncharacteristic of a traditional landlord-tenant relationship.

The Nelsons and the Interested Parties, however, provide evidence that McIlvain and Lucas were not financially dependent on the Nelsons.  As stated above, McIlvain and Lucas did not reside at the Nelsons' home rent free.  (Interested Parties' Summary Judgment Moving Br., at 15.) Indeed, the Interested Parties highlight testimony from Hynes that on one occasion, McIlvain borrowed money from him because the Nelsons threatened to remove her from their property

unless she remitted rent.  (*See* Cook Cert., Ex. K, Hynes' Dep. Tr., 21:7 to 23.)[5]  McIlvain also testified that on another occasion, she purchased groceries for the Nelsons in lieu of making a rental payment.  (*See* Cook Cert., Ex. B, McIlvain's Dep. Tr., 46:15 to 47:2.)  Moreover, McIlvain and the Nelsons testified that upon moving into the Nelsons' home, McIlvain and Lucas brought their own personal items and purchased their own groceries.  (*Id.* at 19:11 to 18, 35:10 to 37:2.)[6]  With respect to the purchase of the Ford F-150 truck, the record shows that despite title for the vehicle being in Raymond's name, McIlvain paid the monthly lease payment of $330.00.  (Cook Cert., Ex. B, McIlvain's Dep. Tr., 44:9 to 13.)  Further, McIlvain testified that she intended to contribute toward the insurance for the vehicle; however, those contributions were not discussed with the Nelsons and never occurred.  (*Id.* at 38:14 to 39:25.)  Prior to Lucas' death, the Nelsons approached McIlvain about "skyrocketing" insurance costs and requested that McIlvain pay $3,000.00 to assist with the payments.  (*Id.*)  As a result, McIlvain's husband paid the Nelsons $3,000.00 just prior to Lucas' drowning.  (*Id.*)  Further, despite making the monthly lease payments for the vehicle, McIlvain returned the truck to the Nelsons following Lucas' death.  (*Id.* at 36:23 to 25.)

Next, the record is unclear regarding how often McIlvain and Lucas participated in the Nelsons' intimate family gatherings, such as meals, and how frequently McIlvain aided the Nelsons in everyday household chores.  It is undisputed that McIlvain and the Nelsons never engaged in any group social activities outside of the home in the three months that McIlvain and

---

[5]     With respect to McIlvain's potentially missed rental payments, Raymond testified that he and Maria never discussed removing McIlvain from their home.  (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 15:23 to 16:7.)

[6]     Raymond also testified that groceries and towels were shared amongst the Nelsons and McIlvain during the three months that McIlvain lived at the Nelsons' residence.  (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 21:23 to 22:10, 22:22 to 23:1.)

Lucas lived at the Nelsons' residence.  (*See* Cook Cert., Ex. H, McIlvain's Dep. Tr., 35:17 to 19; *see also* Blake Cert., Ex. B, Raymond's Dep. Tr., 28:9 to 15.)  Specifically, Raymond testified that while McIlvain and Lucas lived at his home, McIlvain and the Nelsons never made any trips to the beach, the lake, or went on any picnics or engaged in any other social activities together.  (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 28:9 to 15.)  However, McIlvain testified that she and Lucas spent the Fourth of July with the Nelson family and no one else was in attendance.  (Cook Cert., Ex. B, McIlvain's Dep. Tr., 39:15 to 40:6.)  As for shared meals and daily household obligations, generally, the Court finds the record unsettled.  Indeed, McIlvain testified that she and Lucas did not eat meals with the Nelsons.  (*See* Cook Cert., Ex. H, McIlvain's Dep. Tr., 34:14 to 15.)  Maria, however, testified that McIlvain and Lucas ate "every meal" with the Nelsons, while Raymond testified that meals were shared "a few times a week."  (*See* Cook Cert., Ex. C, Maria's Dep. Tr., 29:24 to 30:3; Raymond Dep. 123.19 at 18:10 to 15.)  Similarly, Raymond testified that although McIlvain did not have a list of daily chores or household obligations, she cleaned the kitchen when it became dirty and swept and mopped the floors of the home as needed.  (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 27:4 to 11.)  Conversely, McIlvain testified only that she cleaned up after herself and Lucas, which included washing her and Lucas' clothes separate from the Nelsons.  (*See* Cook Cert., Ex. B, McIlvain's Dep. Tr., 19:11 to 18.)  These disputed issues of material fact will be left for the trier of fact following an assessment of each witness' credibility. *See Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir.2004) ("In considering a motion for summary judgment a District Court may not make credibility determinations ...").

Finally, the parties present conflicting evidence regarding the nature of the relationship between the Nelsons and McIlvain and Lucas, including the role the Nelsons assumed in Lucas' life.  Plaintiff suggests that McIlvain and Lucas shared an intimate personal relationship with the

Nelsons, and even referred to the Nelsons as "family." (Pl.'s Summary Judgment Moving Br., at 17.) In support, Plaintiff offers testimony from Raymond and McIlvain in which both admit that they considered each other "family." (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 21:17 to 22; Cook Cert., Ex. H, McIlvain's Dep. Tr., 34:16 to 35:3.) Specifically, Raymond testified that he viewed Lucas as a grandson and McIlvain as a daughter. (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 33:19 to 24.) In addition, Raymond testified that McIlvain referred to him as "Dad" on occasion and that Lucas would often call him "Grandpa" and would refer to Maria as "Grandma." (*Id.* at 27:18 to 25.) Although McIlvain testified that she considered the Nelsons to be family, she emphatically testified that Lucas never referred to Raymond as "grandpa" or "pa." (*See* Cook Cert., Ex. B, McIlvain's Dep. Tr., 34:16 to 35:9). According to McIlvain, she asked Lucas to call Raymond and Maria "Uncle Ray" and "Aunt Maria," but this was only meant as a sign of respect. (*Id.* at 35:1 to 9.)

Factual disputes also exist regarding the role taken by the Nelsons in Lucas' life prior to his death. Raymond testified that he picked Lucas up from the bus stop after school, occasionally watched Lucas in the evenings while McIlvain finished work, and even watched Lucas when McIlvain had plans with her boyfriend. (*See* Blake Cert., Ex. B, Raymond's Dep. Tr., 25:2 to 10, 26:3 to 11, 31:21 to 22.) Plaintiff maintains that these facts demonstrate the existence of an integrated familial relationship. The Nelsons and the Interested Parties, however, stress that McIlvain and Lucas were not related to the Nelsons and that the living arrangement was purely temporary. Moreover, the Interested Parties emphasize the fact that the Nelsons did not even meet McIlvain and Lucas until approximately three months prior to Lucas' death.

When reviewed collectively, these issues of fact, which encompass elements of joint domesticity and social connectivity, relate directly to the degree to which McIlvain and Lucas were

integrated into the Nelsons' family unit, an issue that this Court cannot resolve on these motions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 93-94 (3d Cir. 2018) (A factual dispute is genuine if a reasonable factfinder could return verdict for non-movant, and it is material if, under substantive law, it would affect outcome of suit). Because the finder of fact will need to weigh the credibility of the various witnesses, the Court denies the motions for summary judgment filed by Plaintiff, the Nelsons, and the Interested Parties as to whether the Policy's personal liability exclusion bars defense and indemnification coverage in connection with Lucas' death based on Lucas' status as a resident of the insured's household.

### B.    The Insured Exclusion

Alternatively, Plaintiff contends that coverage is precluded by the same exclusion provision because Lucas met the Policy's definition of an "Insured" at the time of his death. (Pl.'s Summary Judgment Moving Br., at 18.) The Court disagrees. In relevant part, the Policy defines the term "Insured" as follows:

> a. you;
>
> b. permanent residents of your household who are:
>
>> (1) your relatives; or
>>
>> (2) other persons under the age of 21 and in the care of any person described above in subsection a. or b. (1)[.]

(*See* Cook Cert., Ex. E at Definitions, page 6.) Therefore, to be considered an "Insured" under the Policy, Lucas must have been 1) a permanent resident of the household, 2) under the age of twenty-one years old, <u>and</u> 3) in the care of Raymond, Maria, or one of their relatives residing at the household.

Here, Lucas was neither a permanent resident of the Nelsons' household, nor was he in the care of anyone other than McIlvain while living at the Nelsons' home.  First, Plaintiff argues that McIlvain and Lucas were permanent residents because the Nelsons permitted them to stay for an indefinite amount of time.  (Pl.'s Summary Judgment Moving Br., at 22.)  Based on the sworn statements of McIlvain and the Nelsons, however, it is undisputed that McIlvain and Lucas were only living at the Nelsons' house until McIlvain located more permanent housing in the area.[7] Indeed, living at the Nelsons' home allowed Lucas to attend school in Howell while McIlvain saved money for an apartment.  (*See* Cook Cert., Ex. H, McIlvain's Dep. Tr., at 26:10 to 12.)  When asked how long she intended to reside at the Nelsons' home, McIlvain testified that her "goal was to be out within a few months."  (*See* Cook Cert., Ex. H, McIlvain's Dep. Tr., 25:19 to 26:9.)  Specifically, McIlvain testified that she only intended to stay "between three and five" months.  (*Id.* at 26:10 to 12.)  McIlvain's temporary status is further supported by the sworn statements of Raymond and Maria who confirmed that they never intended for the living arrangement to be permanent and only offered McIlvain a place to live "to help her get back on her feet."  (*See* Malatesta Cert., Ex. B, Raymond's Dep. Tr., 37:18 to 21; Cook Cert., Ex. C, Maria's Dep. Tr., 26:4 to 14.)  Plaintiff has not adduced any contrary evidence on this issue, and therefore, I find that McIlvain and Lucas were temporarily living at the Nelsons' home.  *See Maddox v. City of Newark*, 50 F. Supp. 3d 606, 626 (D.N.J. 2014) (finding summary judgment in favor of defendants where plaintiff failed to offer contradictory evidence).

Second, Lucas was not "in the care of" Maria, or any other insured as defined by the Policy, at the time of his death.  Plaintiff relies solely on Maria's purported admission that she was

---

[7]     Importantly, as set forth in Part III(A), the Court does not make any determinations at this time regarding McIlvain's or Lucas' status as residents of the Nelsons' household.  Rather, here, the Court merely finds that McIlvain and Lucas were not permanently living at the Nelsons' home.

responsible for Lucas prior to the drowning incident and contends that Lucas' age and autism diagnosis necessitated "heightened or closer supervision."  (Pl.'s Summary Judgment Moving Br., at 22.)  In support of its position, Plaintiff relies exclusively on *Priest v. Roncone*, 370 N.J. Super. 537, 541 (App. Div. 2004), in which the New Jersey Appellate Division found that a decedent qualified as an "insured" within the meaning of an insurance policy, and therefore, was excluded from the class of potential claimants.  In that case, like here, the parties disputed whether the decedent was "in the care of" the insured at the time of her death.  In construing the phrase "in the care of," the Appellate Division adopted the following factors from *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 596 N.W.2d 190 (1999):

> (1) is there a legal responsibility to care for the person;
> (2) is there some form of dependency;
> (3) is there a supervisory or disciplinary responsibility;
> (4) is the person providing the care providing substantial essential financial support;
> (5) is the living arrangement temporary or permanent, including how long it has been in existence and is expected to continue;
> (6) what is the age of the person alleged to be "in the care of" another (generally, the younger a person the more likely they are to be "in the care" of another);
> (7) what is the physical or mental health status of the person alleged to be "in the care of" another (a person with health problems is more likely to be "in the care" of another); and
> (8) is the person allegedly "in the care of" another gainfully employed (a person so employed is less likely to be truly dependent on another)?

*Id.* at 545.

In *Roncone*, it was not disputed that the deceased child was a permanent resident in the house of Roncone, who held the homeowner's policy.  *Id.* at 543.  Roncone was involved in a two-year monogamous relationship with the mother of the deceased child.  *Id.* at 542.  Roncone and the child's mother also shared a daughter of their own.  *Id.*  Despite Roncone not being the

decedent's biological father, the child considered Roncone to be a "father figure." *Id.* Indeed, the decedent lived in Roncone's home along with her mother and half-sister. *Id.* Roncone regularly cared for the decedent on evenings and weekends when her mother worked. *Id.* On one such Saturday morning, while Roncone cared for the two girls, the decedent sustained injuries that later resulted in her death. *Id.* Following a jury trial, Roncone was convicted of second-degree manslaughter. *Id.* Accordingly, in applying the *Henderson* factors, the appellate panel found that the decedent was left in the sole physical care of Roncone on the day of her death, Roncone was the only adult in the house, Roncone was responsible for her supervision, nourishment, and general well-being, and the living arrangement at Roncone's home was permanent and long-standing. *Id.* at 546.

Here, Plaintiff argues that Maria's responsibility for Lucas at the time of his death is undisputed. (Pl.'s Summary Judgment Moving Br., at 20.) Plaintiff contends, without further support, that because Maria "admitted she was responsible for Lucas at the time of his drowning," Lucas depended on Maria, Maria had a supervisory responsibility, and a legal responsibility existed for Maria to care for Lucas at the time of the drowning incident. (Pl.'s Summary Judgment Moving Br., at 22.) The facts of this case, however, are plainly distinguishable from those found in *Roncone* and an application of the *Henderson* factors weighs heavily in the Nelsons' and the Interested Parties' favor. As to the Nelsons' legal responsibility for Lucas, Lucas was not related to the Nelsons through blood or marriage and the living arrangement was purely temporary. Importantly, the Nelsons only met McIlvain and Lucas three months prior to Lucas' death, and Plaintiff has not provided any evidence that the Nelsons had guardianship rights or any other legal rights over Lucas. Similarly, no evidence exists that McIlvain and Lucas were dependent on the Nelsons or that the Nelsons provided essential financial support. Although Plaintiff has presented

evidence that the Nelsons assisted McIlvain with the lease of a vehicle, that the Nelsons accepted groceries in lieu of at least one rental payment, and that food may have been shared, these facts do not rise to the level of dependency.  In fact, it is undisputed that McIlvain was gainfully employed while living at the Nelsons' home, paid some rent to live at the residence, and provided personal care items for herself and Lucas.  As for the leased Ford F-150 truck, McIlvain made monthly car payments and paid the Nelsons partially for insurance costs.  As such, there is no evidence to support a finding that McIlvain and Lucas were somehow financially dependent upon the Nelsons.

Next, despite Lucas' young age, the Court does not find that Maria had a supervisory or disciplinary responsibility for Lucas at the time of his death.  Unlike in *Roncone*, Maria was not the only adult present at the Nelson residence when Lucas died.  (*See* Cook Cert., Ex. C, Maria's Dep. Tr., 8:2 to 7.)  In fact, McIlvain was also present and had only asked Maria to briefly watch Lucas in the pool while she changed her niece's diaper.  (*Id.* at 8:8 to 18.)  According to Maria, she removed the children, including Lucas, from the pool area so that she could prepare dinner. (*Id.* at 9:10 to 25.)  The children, including Lucas, continued to play in the Nelsons' yard upon leaving the pool area.  (*See* Malatesta Cert., Ex. B, Raymond's Dep. Tr., 12:9 to 15.)  Maria testified that she believed it was McIlvain's responsibility to watch Lucas once the children left the pool.  (*Id.* 21:10-14.)  It was during this time, however, that Lucas tragically regained access to the pool and drowned.  Based on the foregoing, this Court cannot find that McIlvain's isolated and discrete request that Maria watch Lucas while she changed her niece's diaper was sufficient to place Lucas in Maria's care.  Accordingly, the Court denies Plaintiff's claim that Lucas qualified as an "insured" under the terms of the Policy.

### C.      Public Policy Considerations

Finally, to the extent the Nelsons and the Interested Parties attempt to argue that the Policy

violates public policy, those claims are denied.  An agreement violates public policy if it:

> is injurious to the interest of the public, contravenes some
> established interest of society, violates some public statute, is
> against good morals, tends to interfere with the public welfare or
> safety, or ... is at war with the interests of society and is in conflict
> with public morals.

*Frank Briscoe Co. v. Travelers Indem. Co.*, 65 F.Supp.2d 285, 312 (D.N.J. 1999) (citation and

internal quotations omitted).  Public policy has been invoked in the insurance context where the

terms of the policy might "encourage practices clearly against some recognized conception of the

public good."  *Rotwein v. Gen. Acc. Grp.*, 103 N.J. Super. 406, 416 (Law Div. 1968).  Indeed,

"Insurance contracts have been declared unenforceable where they are patently offensive or

inimical to the public welfare and have a clear capacity to support or encourage conduct which is

deleterious, anti-social or unlawful."  *Id.*

Here, the Nelsons argue, in a conclusory fashion, that should the Policy be construed

against them, the impact would unfairly injure "any homeowner who takes someone in off the

street to help them out temporarily." (Nelsons' Summary Judgment Moving Br., at 15.)  However,

the Nelsons fail to show how the Policy violates any statute or interferes with any recognized

public interest.  Without any recognized public policy at issue the Court rejects the Nelsons'

argument that the Policy contravenes public policy.

### IV.   <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is **DENIED**, the

Nelsons' Motion for Summary Judgment is **GRANTED in part**, and **DENIED in part**, and the

Interested Parties' Motion for Summary Judgment is **GRANTED in part**, and **DENIED in part**,

as follows: because issues of genuine material fact exist as to whether McIlvain and Lucas were residents of the Nelsons' household under the insurance policy's personal liability exclusion provision, summary judgment on this question is denied.  However, the Court grants summary judgment in favor of the Nelsons and the Interested Parties on the issue that Lucas was not an "Insured" under the Nelsons' insurance policy.


Dated: October 5, 2020                                        /s/ Freda L. Wolfson_____
                                                             Hon. Freda L. Wolfson
                                                             U.S. Chief District Judge